UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| VALLI T. CHIN, individually and on behalf of all others similarly situated, Plaintiff, | Civil Action No. _______________ |
| vs. | Class Action |
| VALE S.A., MURILO PINTO DE OLIVEIRA FERREIRA, LUCIANO SIANI PIRES, and PETER POPPINGA, Defendants. | **Class Action Complaint for Violations of the Federal Securities Laws** |
| | **Jury Trial Demanded** |

Plaintiff Valli T. Chin ("Plaintiff"), by and through her counsel, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief are based upon, *inter alia*, counsel's investigation, which included review and analysis of: (a) regulatory filings made by Vale S.A. ("Vale" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (b) press releases and media reports issued by and disseminated by the Company; (c) analyst reports concerning Vale; and (d) other public information regarding the Company.

## INTRODUCTION

1. This class action is brought on behalf of purchasers of Vale securities between November 7, 2013 and November 30, 2015, inclusive (the "Class Period"). The claims asserted herein are alleged against Vale, Vale's Chief Executive Officer, Murilo Pinto de Oliveira Ferreira, Vale's Chief Financial Officer, Luciano Siani

Pires, and Vale's Executive Director for Ferrous Minerals, Peter Poppinga (collectively, "Defendants"), and arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder.

2. Vale is one of the largest miners of iron-ore in the world. In addition to operating its own iron ore mines in Brazil, Vale owns a 50% stake in Samarco Mineração S.A. ("Samarco"), a company with mining facilities in the Brazilian states of Minas Gerais and Espírito Santo. As part of its mining operations, Samarco owns several dams — including the Fundão Dam — which are used to dispose of mining waste.

3. Throughout the Class Period, Defendants repeatedly stressed Vale's commitment to the safety of its operations. In addition, Vale regularly touted the growing output from its Mariana mining system, which is located in close proximity to the Fundão Dam and was secretly dependent on the dam for waste disposal. At no time during the Class Period did Vale reveal the precarious nature of the Fundão Dam or that the Company had used the dam for disposal of its own mining waste — not just that of Samarco — and was directly responsible for a significant portion of the waste dumped into the Fundão Dam. Moreover, Vale did not disclose that the viability of Vale's own mining operations located in the vicinity of the Fundão Dam was largely dependent on the availability of the dam to dispose of mining waste. Finally, Vale did not disclose that it limited its expenses and increased margins by failing to build the necessary waste facilities at its directly-owned mines, dumping

waste from its own mines at Samarco to offload the waste management costs from Vale to Samarco, and avoiding the expense of improving or replacing the Fundão Dam. As a result of the Company's misrepresentations, Vale ADRs traded at artificially inflated prices throughout the Class Period.

4. The truth began to be revealed on May 12, 2015, when Moody's issued a negative outlook for Vale and warned that the ratings outlook could worsen if Vale "is not able to make meaningful progress in cost reduction." As a result of the Moody's downgrade, the price of Vale common stock ADRs declined by $0.29 per ADR and Vale preferred stock ADRs declined by $0.14 per ADR.

5. Days later, on May 18, 2015, Standard & Poor's downgraded Vale and warned of Samarco's need to maintain its "low-cost operations" and to manage its debt. As a result of the Standard & Poor's downgrade, the price of Vale common stock ADRs declined by an additional $0.44 per ADR and Vale preferred stock ADRs declined by an additional $0.30 per ADR.

6. Then, on November 5, 2015, the Fundão Dam burst, releasing a wave of toxic sludge into the nearby river valley. The collapse and flooding caused at least 17 deaths, among them several of the Company's own employees. News of the dam bursting caused the price of Vale common and preferred stock ADRs to lose over $350 million in value.

7. On November 7, 2015, *The Wall Street Journal* reported that in October 2013, a local prosecutor's office commissioned a report to test the stability of the Fundão Dam. That report included a series of warnings about the dam and

highlighted "the possibility of destabilization." As a result of these disclosures, the price of Vale common stock ADRs and preferred stock ADRs each fell an additional $0.09 per ADR.

8. On November 10, 2015, *The Wall Street Journal* revealed evidence that Vale was dumping debris from its own nearby iron-ore mines — not just those operated by Samarco — directly into the Fundão Dam, further pressuring the dam system. These disclosures caused the price of Vale common stock ADRs to fall $0.07 per ADR and preferred stock ADRs fell $0.02 per ADR.

9. After the market closed on November 24, 2015, *The Wall Street Journal* revealed additional details regarding the arrangement for Vale to use Samarco's dam system. In particular, *The Wall Street Journal* revealed that the Fundão Dam had undergone rapid growth in recent years. Between 2012 and 2015, the volume of tailings grew from 5 million cubic meters to 55 million cubic meters. *The Wall Street Journal* also raised questions about whether a contract that allowed Vale to dump waste from its nearby iron-ore mine into the Fundão Dam was properly licensed and monitored.

10. The following day, the Office of the United Nations High Commissioner for Human Rights disclosed that, contrary to the Company's prior assertions, the tailings dam contained high levels of toxic chemicals, which were unleashed into the Rio Doce. As a result of the November 24 and 25 disclosures, Vale common stock ADRs fell $0.16 per ADR and preferred stock ADRs fell $0.13 per ADR.

11. Then, on November 27, 2015, Vale acknowledged for the first time the presence of toxic elements in the Rio Doce. Specifically, the Company cited a report that found that the levels of several toxic heavy metals far surpassed legal limits. Following the Company's admission, the Brazilian government stated its intent to file suit against Vale and Samarco for their involvement in the dam failure. These disclosures caused the value of Vale common stock ADRs to fall $0.16 per ADR and preferred stock ADRs to fall $0.15 per ADR.

12. Finally, on November 30, 2015, the Brazilian government filed a lawsuit against Vale and Samarco, seeking $5.2 billion in damages caused by the dam collapse. The announcement of the lawsuit caused the price of Vale common stock ADRs to fall $0.20 per ADR, or over 5%, to close at $3.37, and Vale preferred stock ADRs to fall $0.28 per ADR, or 9.5%, to close at $2.68.

13. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

14. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

15. Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b). The Company's securities are listed on the New York Stock Exchange ("NYSE"), which is located in this District, and many of the acts and conduct that constitute the violations of law complained of herein, including dissemination to the public of materially false and misleading information, occurred in and/or were issued from this District. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

**PARTIES**

16. Plaintiff Valli T. Chin, as set forth in the accompanying certification, purchased Vale common stock American Depositary Receipts ("ADRs") on the NYSE during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

17. Defendant Vale is a mining company incorporated in Brazil and headquartered in Rio de Janeiro, Brazil. During the Class Period, the Company's common stock ADRs traded on the NYSE under the symbol "VALE" and the Company's preferred stock ADRs traded on the NYSE under the symbol "VALE/P."

18. Defendant Murilo Pinto de Oliveira Ferreira ("Ferreira") was, at all relevant times, the Company's Chief Executive Officer.

19. Defendant Luciano Siani Pires ("Siani") was, at all relevant times, the Company's Chief Financial Officer.

20. Defendant Peter Poppinga ("Poppinga") was, since November 2014, the Company's Executive Director for Ferrous Minerals. Prior to that, Poppinga was Executive Director for Base Metals and Information Technology, since 2011. During the Class Period, Poppinga was also the Chairman of the Board of Directors of Samarco.

21. Defendants Ferreira, Siani, and Poppinga are collectively referred to hereinafter as the "Individual Defendants." The Individual Defendants, because of their positions with Vale, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors. Each of the Individual Defendants was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.

## BACKGROUND

22. Based in Brazil, Vale is the world's largest producer of iron ore and nickel, and is engaged in mineral exploration in six countries around the world. In addition to operating its own iron ore mines in Brazil, Vale owns a 50% stake in

Samarco, which operates an integrated iron ore mining system in the Brazilian states of Minas Gerais and Espírito Santo. Samarco has three dams — the Fundão Dam, the Santarem Dam, and the Germano Dam — which are used to hold back waste or byproduct left over from mining (referred to as "tailings").

23. A tailings dam is an earth-fill embankment dam used to store mining waste. Unlike conventional water retention dams, a tailings dam is raised in succession throughout the life of the particular mine. Typically, a base or starter dam is constructed, and as it fills with a mixture of tailings and water, it is raised to accommodate additional waste. Material used to raise the dam can include the tailings themselves along with dirt.

24. According to the Center for Science in Public Participation, the rate of serious design failures in tailing dams is increasing. Nearly half of serious tailings dam failures in the last 70 years occurred in the 20 years between 1990 and 2009. The increasing rate of design failures in tailing dams is directly related to the increasing number of tailings dams larger than 5 million cubic meters — the capacity needed to allow the economic extraction of lower grades of ore. By comparison, during the past three years, Samarco's Fundão Dam grew from 5 million cubic meters to an astonishing 55 million cubic meters. Moreover, as of November 2015, Samarco was in the process of increasing the size of the dam even further.

25. Given the increasing frequency of dam failures, tailings dams are often the most significant environmental liability for any mining project. Accordingly,

Vale's public statements regarding its dedication and commitment to the safety of its operations were of paramount importance to investors.

26. On November 5, 2015, the Fundão Dam burst unleashing a wave of toxic mud and mining waste onto a small village in the valley below. Several people were killed by the accident and hundreds of thousands were displaced or left without clean drinking water.

## I. Defendants' Materially False and Misleading Statements Caused Substantial Losses to Investors

27. On November 6, 2013, Vale issued a press release announcing production highlights for the third quarter of 2013. In the press release, which was filed with the SEC on Form 6-K, the Company reported iron ore output of 85.9 Mt,[1] which it characterized as Vale's "second best quarter ever." The Company also touted that "[o]utput increased 17.3% . . . with across the board gains in all systems, Northern, Southeastern, Southern, and Midwestern, as well as Samarco." Specifically, Vale stated that the iron ore of its Mariana mining system was "13.7% and 10.6% higher than 2Q13 and 3Q12, respectively, being the highest quarter since 3Q08." The Company attributed the significant growth in production of its Mariana system to "the beginning of the exploitation of new mine sections at Fábrica Nova, made possible by a mining license granted at the end of May."

28. That same day, Vale issued a press release announcing its financial results for the third quarter of 2013. In the press release, which was filed with the SEC on Form 6-K, the Company stated that it was taking steps to "build a lean

[1] "Mt" stands for million metric tons.

organization," in part, by "minimizing operating costs and expenses." The Company touted $2 billion in savings, which it attributed, in significant part, to decreasing operating costs by $1.126 billion.

29. On December 2, 2013, the Company held a conference with analysts and investors to discuss the Company's earnings and operations. During the conference — which was held in New York — Ferreira, Siani, and Poppinga emphasized the Company's commitment to safety and environmental responsibility. Specifically, the slides used during the presentation, and filed with the SEC on Form 6-K, touted the Company's "culture of genuine care delivering operational excellence," the "implementation of the health and safety management system," and Vale's focus on "[r]isk reduction through technical improvements." The slides also assured investors that Vale would deliver value to shareholders through a focus on "[s]afety, sustainability and [the] environment."

30. On March 27, 2014, Vale filed with the SEC its annual report on Form 20-F for the fiscal year ended December 31, 2013. In the annual report, the Company stated that it had "health, safety and environmental standards and risk management systems and processes in place to mitigate the risk of" environmental, health, and safety incidents. The annual report also warns that "[n]otwithstanding our standards, policies and controls, our operations remain subject to incidents or accidents that could adversely affect our business or reputation." The Company omitted that such risks had already materialized.

31. In the annual report, Vale also warned that:

> some of our assets may be controlled and managed by joint venture partners that may not fully comply with our standards, controls and procedures, including our health, safety, environment and community standards. Failure by any of our partners to adopt standards, controls and procedures equivalent to ours could lead to higher costs, reduced production or environmental, health and safety incidents or accidents, which could adversely affect our results and reputation.

The Company omitted that such risks had already materialized.

32. On April 30, 2014, Vale issued a press release announcing production highlights for the first quarter of 2014. In the press release, which was filed with the SEC on Form 6-K, the Company announced that it "reached 71.1 Mt of iron ore production, the best performance for a first quarter since 1Q08, with gains in the Northern, Southeastern and Southern Systems compared to 1Q13." The press release also stated that "[o]utput of the Mariana mining hub of 9.6 Mt was a new record for a first quarter due to the exploitation of new mine sections at Fábrica Nova, as a result of a mining license granted at the end of May, 2013."

33. Also on April 30, 2014, Vale issued a press release announcing its financial results for the first quarter of 2014. In the press release, which was filed with the SEC on Form 6-K, the Company announced that it "delivered a strong operational performance in 1Q14, with iron ore production reaching 71.1 Mt, the best performance for a first quarter since 1Q08." The press release also stated that the Company's "continued cost cutting efforts" resulted in a "reduction in costs and expenses" of $218 million as compared to the prior year quarter.

34. That same day, Vale held a conference call with analysts and investors to discuss the Company's earnings and operations. During the conference call, Siani

assured investors of the Company's dedication to safety. Specifically, Siani stated that "we within Vale want to take this opportunity to repeat that all of the executive officers and our CEO are committed to achieving the highest possible health and safety standards in our operations."

35. On July 24, 2014, Vale issued a press release announcing production highlights for the second quarter of 2014. In the press release, which was filed with the SEC on Form 6-K, the Company announced that it "reached 79.4 Mt of iron ore production, the best performance ever for a second quarter, with gains in all production Systems when compared to 1Q14." The press release also stated that "[o]utput of the Mariana mining hub reached 9.6 Mt, the best performance for a second quarter since 2Q11, as a result of the exploitation of new mine sections at Fábrica Nova following the grant of a mining license at the end of May 2013."

36. On July 31, 2014, Vale issued a press release announcing its financial results for the second quarter of 2014. In the press release, which was filed with the SEC on Form 6-K, the Company announced that it "delivered a strong operational performance in 2Q14, with iron ore production reaching 79.4 Mt, the best performance for a second quarter ever." The press release also stated that as a result of the Company's continued cost cutting efforts, Vale "managed to reduce costs and expenses" by $249 million compared to the prior year quarter.

37. On October 23, 2014, Vale issued a press release announcing production highlights for the third quarter of 2014. In the press release, which was filed with the SEC on Form 6-K, the Company announced that it "reached 85.7 Mt

of iron ore production . . . the highest output in Vale's history, with gains in all production Systems when compared to 2Q14." The press release also stated that "[o]utput of the Mariana mining hub reached 10.2 Mt, the best ever quarterly performance, 5.8% higher than in 2Q14, as a result of good operational performance after the exploitation of new mine sections at Fábrica Nova following the grant of a mining license at the end of May 2013."

38. On October 30, 2014, Vale issued a press release announcing its financial results for the third quarter of 2014. In the press release, which was filed with the SEC on Form 6-K, the Company announced that it "delivered a strong operational performance in 3Q14, with iron ore production reaching 85.7 Mt, the highest output in Vale's history." The press release also stated that as a result of the Company's continued cost cutting efforts, Vale reduced costs and expenses by $271 million compared to the prior year quarter.

39. On February 26, 2015, Vale issued a press release announcing its financial results for the fourth quarter of 2014. In the press release, which was filed with the SEC on Form 6-K, the Company announced that "[i]n 2014, [Vale] achieved several production records," which included record annual iron ore production of 319.2 Mt, and quarterly iron ore production of 83.0 Mt, a record for a fourth quarter. The press release also stated that in 2014, Vale reduced annual operating expenses by over $1.2 billion year-over-year.

40. On March 20, 2015, Vale filed with the SEC its annual report on Form 20-F for the fiscal year ended December 31, 2014. In the annual report, the

Company stated that it had "health, safety and environmental standards and risk management programs and procedures in place to mitigate" risk of environmental, health, and safety incidents. The annual report also warns that "[n]otwithstanding our standards, policies and controls, our operations remain subject to incidents or accidents that could adversely affect our business or reputation." The Company omitted that such risks had already materialized.

41. In the annual report, Vale also warned that:

> some of our assets may be controlled and managed by joint venture partners that may not fully comply with our standards, controls and procedures, including our health, safety, environment and community standards. Failure by any of our partners to adopt standards, controls and procedures equivalent to ours could lead to higher costs, reduced production or environmental, health and safety incidents or accidents, which could adversely affect our results and reputation.

The Company omitted that such risks had already materialized.

42. On April 30, 2015, Vale issued a press release announcing its financial results for the first quarter of 2015. In the press release, which was filed with the SEC on Form 6-K, the Company announced that it "reached iron ore production of 74.5 Mt in 1Q15, the highest output for a first quarter in Vale's history." The press release also stated that as a result of the Company's continued cost cutting efforts, Vale reduced costs and expenses by $561 million compared to the prior year quarter.

43. That same day, Vale held a conference call with analysts and investors to discuss the Company's earnings and operations. During the conference call, Poppinga assured investors of the Company's dedication to safety. Specifically,

Poppinga stated that "[y]ou will see a different Vale in the next months, quarters and years, very focused on productivity and cost-cutting; of course, also on health and safety, more and more."

44. The statements and omissions set forth above were materially false and misleading because Defendants knew or should have known that: (1) Vale's business model was based, in part, on its ability to dump waste from its Mariana iron mining operations into the Fundão Dam; (2) beginning in at least October 2013, several engineers had warned of cracks in the Fundão Dam and the possibility of destabilization; (3) Vale's controls and procedures to mitigate environmental, health and safety incidents were inadequate; and (4) as a result, Defendants' statements about the Company's business and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## II. The Truth About Vale's Efforts to Cut Costs Begins to Be Revealed

45. The truth began to be revealed on May 12, 2015, when Moody's issued a negative outlook for Vale and warned that the ratings outlook could worsen if Vale "is not able to make meaningful progress in cost reduction." Moody's expressed particular concern about the impact of iron ore prices on Vale "in a period in which Vale is undergoing a large expansion phase with substantial capital expenditures." As a result of the Moody's downgrade, the price of Vale's common stock ADRs declined by $0.29 per ADR and Vale's preferred stock ADRs declined by $0.14 per ADR.

46. Days later, on May 18, 2015, Standard & Poor's downgraded Vale and warned of Samarco's need to maintain its "low-cost operations" and to manage its debt. As a result of the Standard & Poor's downgrade, the price of Vale's common stock ADRs declined by an additional $0.44 per ADR and Vale's preferred stock ADRs declined by an additional $0.30 per ADR.

47. Following these disclosures, the Company continued to tout the increased production of its Mariana system, as well as Vale's declining operating costs.

48. On July 23, 2015, Vale issued a press release announcing its financial results for the second quarter of 2015. In the press release, which was filed with the SEC on Form 6-K, the Company announced that it "reached 85.3 Mt of iron ore production in the second quarter of 2015 . . . representing the second highest quarterly production in Vale's history and the highest production in a second quarter." The press release also stated that "[o]utput from the Mariana mining hub reached 9.7 Mt, in line with production in 1Q15 and in 2Q14."

49. On October 19, 2015, Vale issued a press release announcing its financial results for the third quarter of 2015. In the press release, which was filed with the SEC on Form 6-K, the Company announced that it "reached 88.2 Mt of iron ore production in the third quarter of 2015 . . . representing the highest quarterly production in Vale's history." The press release also stated that "[p]roduction at the Mariana mining hub was 10.3 Mt, 6.3% and 1.1% higher than in 2Q15 and 3Q14, respectively."

50. On October 22, 2015, Vale issued a press release reiterating its financial results for the third quarter of 2015. In the press release, which was filed with the SEC on Form 6-K, the Company announced that it reduced quarterly operating costs by $288 million compared to the prior quarter. The statements and omissions set forth in ¶¶ 27–49 were materially false and misleading because Defendants knew or should have known that: (1) Vale's business model was based, in part, on its ability to dump waste from its Mariana iron mining operations into the Fundão Dam; (2) beginning in at least October 2013, several engineers had warned of cracks in the Fundão Dam and the possibility of destabilization; (3) Vale's controls and procedures to mitigate environmental, health and safety incidents were inadequate; and (4) as a result, Defendants' statements about the Company's business and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## II. Dam Collapse Causes the Worst Environmental Disaster in Brazil's History

51. On November 5, 2015, at approximately 4:20 pm, the Fundão Dam burst releasing a massive wave of toxic sludge into the nearby river valley and causing severe flooding and at least 17 deaths. The collapse caused the equivalent of 20,000 Olympic swimming pools of mud waste to bury a small town of 600 people and affected more than a dozen riverside towns and cities on its way to the Atlantic Ocean over 300 miles downstream. Within two hours of the dam bursting, the tailings of iron ore reached the Rio Doce, a river basin that provides potable water to 230 municipalities. In total, over 250,000 people were left without clean drinking

water. News of the dam bursting caused the price of Vale ADRs to fall significantly, with Vale's common stock ADRs losing 5.7% of their value and falling to $4.14 per ADR, and Vale's preferred stock ADRs losing 4.1% of their value and falling to $3.49 per ADR.

52. On November 7, 2015, *The Wall Street Journal* reported that Brazilian prosecutors opened an investigation into Samarco's compliance with the technical requirements contained in its license to operate the Fundão Dam. In October 2013, when Samarco was seeking to renew its license to operate the dam, the local prosecutors' office commissioned a report to test the stability of the Fundão Dam. That report included a series of warnings about the dam and highlighted "the possibility of destabilization." The report also stated that a dam collapse would "caus[e] a great mass of waste to flow downstream" towards communities that house hundreds of thousands of people. As a result, the report recommended, as a condition for renewing Samarco's license, a contingency plan in case of accidents "given the presence of the population in the community of Bento Rodrigues." The report also recommended further studies be made on the stability of the dam. According to *The Wall Street Journal*, in the wake of the dam collapse, local prosecutors launched an investigation into whether Samarco had ever fulfilled these conditions to the renewal of its license. As a result of these disclosures, the price of Vale common stock ADRs and preferred stock ADRs each fell an additional $0.09 per ADR.

53. On November 10, 2015, *The Wall Street Journal* revealed evidence that Vale was dumping debris from its own nearby iron-ore mines — not just those operated by Samarco — directly into the Fundão Dam, further pressuring the dam system. Vale later admitted that it would cut iron-ore production from two of its nearby mines by three million tons in 2015 and nine million tons next year, indicating that the Company had been relying on the Fundão Dam to dispose of waste from those mines. Significantly, this was the first time investors learned that the viability of Vale's own mining operations was dependent on the Company's ability to dispose of waste in the Fundão Dam. *The Wall Street Journal* also reported that Samarco was ramping up production at its mines when the Fundão Dam collapsed, and workers had been in the process of increasing the capacity of the already enormous Fundão Dam. Following these disclosures, the price of Vale common stock ADRs fell $0.07 per ADR and preferred stock ADRs fell $0.02 per ADR.

54. Then, on November 16, 2015, more than ten days after the dam burst, the Company held its first conference call with analysts and investors to discuss the financial impact the dam collapse would have on Vale's business. In addition to addressing the economic impact of the dam bursting, during the conference call, Vale vehemently denied allegations that the refuse emitted from the dam was toxic. Specifically, CFO Siani, stated that "all the reports from the quality of the material that was deposited in the former Fundão Dam made in 2013 and 2014 classified the tailings as class 2B, which means that they are not dangerous."

55. The statements and omissions set forth above were materially false and misleading because Defendants knew or should have known that the waste spilled from the Fundão Dam contained unlawfully high levels of toxic substances, including arsenic, lead, aluminum, chromium, nickel, and cadmium.

56. After the market closed on November 24, 2015, *The Wall Street Journal* revealed additional details regarding the arrangement for Vale to use Samarco's dam system. In particular, *The Wall Street Journal* revealed that the Fundão Dam had undergone rapid growth in recent years. Between 2012 and 2015, the volume of tailings grew from 5 million cubic meters to 55 million cubic meters. In addition, *The Wall Street Journal* reported that several of the roughly 50 instruments for monitoring dam stability bored into the dam's surface indicated "emergency" levels of pressure and stress prior to its collapse. *The Wall Street Journal* also raised questions about whether a contract that allowed Vale to dump waste from its nearby iron-ore mine into the Fundão Dam was properly licensed and monitored.

57. The following day, the Office of the United Nations High Commissioner for Human Rights revealed that it received new evidence showing that, contrary to the Company's prior assertions, the tailings dam contained high levels of toxic heavy metals and other toxic chemicals, which flowed into the Rio Doce and ultimately spilled into the Atlantic Ocean. As a result of the November 24 and 25 disclosures, Vale common stock ADRs fell $0.16 per ADR and preferred stock ADRs fell $0.13 per ADR.

58. On November 27, 2015, Vale acknowledged for the first time the presence of toxic elements in the Rio Doce. The Company cited a report by the Brazilian Institute of Water Management, which tested water samples taken from the Rio Doce between November 7, 2015 and November 12, 2015 and found that the levels of arsenic, lead, aluminum, chromium, nickel, and cadmium were many times higher than the legal limits. Following the Company's admission, the Brazilian government stated its intent to file suit against Vale and Samarco for their part in the catastrophic dam failure. These disclosures caused the value of Vale common stock ADRs to fall $0.16 per ADR and preferred stock ADRs to fall $0.15 per ADR.

59. Finally, on November 30, 2015, the Brazilian government filed a lawsuit against Vale and Samarco, seeking $5.2 billion in damages and a plan to clean up the environmental disaster caused by the Fundão Dam collapse. As a result of the Brazilian government's lawsuit, the price of Vale common stock ADRs fell $0.20 per ADR, or over 5%, to close at $3.37. Similarly, Vale preferred stock ADRs fell $0.28 per ADR, or 9.5%, to close at $2.68.

60. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## LOSS CAUSATION

61. During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions, and engaged in a scheme to deceive the market. This artificially inflated the price of Vale securities and

operated as a fraud or deceit on the Class. Later, when Defendants' prior misrepresentations and fraudulent conduct were disclosed to the market on May 12, May 18, November 5, November 7, November 10, November 24, November 25, November 27, and November 30, the price of Vale securities fell precipitously, as the prior artificial inflation came out of the price over time. As a result of their purchases of Vale securities during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

**CLASS ACTION ALLEGATIONS**

62. Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased the securities of Vale during the Class Period and were damaged thereby. Excluded from the Class are Defendants and their families, directors, and officers of Vale and their families and affiliates.

63. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. Vale has over 826 million common stock ADRs outstanding and 925 million preferred stock ADRs outstanding, owned by hundreds or thousands of investors.

64. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a) Whether Defendants violated the Exchange Act;

(b) Whether Defendants omitted and/or misrepresented material facts;

(c) Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d) Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

(e) Whether the price of Vale securities was artificially inflated;

(f) Whether Defendants' conduct caused the members of the Class to sustain damages; and

(g) The extent of damage sustained by Class members and the appropriate measure of damages.

65. Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

66. Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

67. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## INAPPLICABILITY OF STATUTORY SAFE HARBOR

68. Vale's "Safe Harbor" warnings accompanying its forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.

69. Defendants are also liable for any false or misleading forward-looking statements pleaded herein because, at the time each such statement was made, the speaker knew the statement was false or misleading and the statement was authorized and/or approved by an executive officer of Vale who knew that the statement was false. None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## PRESUMPTION OF RELIANCE

70. At all relevant times, the market for Vale's securities was an efficient market for the following reasons, among others:

(a) Vale ADRs met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient and automated market;

(b) As a regulated issuer, Vale filed periodic public reports with the SEC and NYSE;

(c) Vale regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d) Vale was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s). Each of these reports was publicly available and entered the public marketplace.

71. As a result of the foregoing, the market for Vale securities promptly digested current information regarding Vale from all publicly available sources and reflected such information in the price of Vale securities. Under these circumstances, all purchasers of Vale securities during the Class Period suffered similar injury through their purchase of Vale securities at artificially inflated prices and the presumption of reliance applies.

72. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), because the Class' claims are grounded on Defendants' material omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's reliance on the Fundão Dam for its nearby mining operations and its inadequate safety controls and procedures —

information that Defendants were obligated to disclose — positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of Vale's iron-mining operations and its commitment to safety and the environment, as set forth above, that requirement is satisfied here.

## COUNT I

## For Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants

73. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

74. During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Vale securities at artificially inflated prices.

75. Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Vale securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

76. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and prospects.

77. During the Class Period, Defendants made the false statements specified above, which they knew or recklessly disregarded to be false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

78. Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. Defendants engaged in this misconduct to conceal Vale's true condition from the investing public and to support the artificially inflated prices of the Company's securities.

79. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Vale securities. Plaintiff and the Class would not have purchased the Company's securities at the prices they paid, or at all, had they been aware that the market prices for Vale securities had been artificially inflated by Defendants' fraudulent course of conduct.

80. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of the Company's securities during the Class Period.

81. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

### For Violation of Section 20(a) of the Exchange Act Against the Individual Defendants

82. Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

83. The Individual Defendants acted as controlling persons of Vale within the meaning of Section 20(a) of the Exchange Act. By virtue of their high-level positions, participation in and/or awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance, and their power to control public statements about Vale, the Individual Defendants had the power and ability to control the actions of Vale and its employees. By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A. Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B. Awarding compensatory damages in favor of Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D. Awarding such equitable/injunctive or other further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

Dated: January 28, 2016

Respectfully submitted,

BOTTINI & BOTTINI, INC.
Francis A. Bottini, Jr.
Albert Y. Chang (AC-5415)

s/ Albert Y. Chang
Albert Y. Chang

7817 Ivanhoe Avenue, Suite 102
La Jolla, California 92037
Telephone: (858) 914-2001
Facsimile: (858) 914-2002
Email: fbottini@bottinilaw.com
achang@bottinilaw.com

*Attorneys for Plaintiff Valli T. Chin*